**Stanford L. BURRIS and Equal Employment Opportunity Commission, Plaintiffs,**

v.

**DAVIDSON TRANSFER AND STORAGE COMPANY, Defendant.**

**Civ. A. No. 77–413.**

United States District Court, D. Delaware.

Aug. 20, 1981.*

---

* A supplemental opinion was filed December 3, 1981 and will be published in a later volume of Federal Supplement.

Joseph J. Farnan, Jr., U. S. Atty., and John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., for plaintiffs; Lanier E. Williams and Nadine D. Mariano, E. E. O. C., Philadelphia, Pa., of counsel.

Steven D. Goldberg, of Theisen, Lank, Mulford & Goldberg, Wilmington, Del., for defendant; Russell H. Gardner and Jeanne M. Phelan of Wolf, Pokempner & Hillman, Baltimore, Md., of counsel.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This case involves an individual claim of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiffs Stanford Burris and the Equal Employment Opportunity Commission ("EEOC") have charged that defendant Davidson Transfer and Storage Company ("Davidson") discriminated by failing to recall Burris from layoff during the period January, 1975 through December, 1979 because of his race.

Burris originally filed charges of employment discrimination with the EEOC against Davidson and General Teamsters Local Union No. 326 ("Union") on May 30, 1975 and October 23, 1975, and received a Notice of Right to Sue from the EEOC on July 27, 1977. On October 25, 1977, Burris filed the complaint in this action alleging discrimination against himself and black persons as a class in Davidson's employment practices and the Union's processing of grievances and referral of work opportunities. Following the withdrawal of Burris's original and substitute counsel, the EEOC moved to intervene on December 10, 1980, principally to assist Burris in prosecuting this case. Subsequently plaintiffs abandoned all claims against Davidson except the allegation of discriminatory failure to recall and moved to dismiss the Union as a defendant. The Court granted this motion, and a bench trial was held on March 16 and 17, and May 12, 1981.

For the reasons stated below, the Court finds plaintiffs' claims to be without merit and denies the requested relief. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law.

## I. STATEMENT OF THE FACTS

Plaintiff Burris is a black man who was employed by defendant Davidson as a driver/dockman. Davidson is a Maryland corporation which prior to January 26, 1981 operated a general freight division engaged in the shipping of general commodity freight from twelve terminals located in various Eastern states, including one terminal in Wilmington, Delaware.[1] At all times relevant to this action, Davidson was a party to collective bargaining agreements with the Union which governed the wages, terms and conditions of employment, including seniority, layoff, and recall of Davidson's driver/dock employees.

Burris began employment with Davidson in February, 1973, and was a member of the Union throughout this employment. After working regularly for 33 days from the date of hire, and in accordance with the terms of

---

1. All further references to Davidson pertain solely to the Wilmington terminal.

the collective bargaining agreement, Burris achieved seniority status on March 9, 1973.

Davidson employed two classifications of drivers: (1) regular drivers who had obtained seniority with Davidson in accordance with the terms of the collective bargaining agreement, and (2) temporary or "casual" drivers who were hired on a daily basis as needed and did not have any seniority rights under the Union contract. Davidson annually posted lists showing the relative seniority of its drivers.

The seniority classification could be subdivided into three groups. The most senior employees enjoyed the status of regular employment. They were drivers/dockmen who had an assigned starting time or route and who worked daily according to this assigned schedule. In the second classification were "on-call" employees: those who had no assigned starting time or route and had no assurance of daily work. The "on-call" drivers were obligated to work for Davidson, if needed, and were required to call the terminal to verify that Davidson would not have work for them before they could accept other employment. In the third seniority group were those employees on layoff. They were required to accept permanent recall from layoff, but they had no contractual duty to accept day-to-day offers of employment. Employees on layoff were free to accept other offers of employment without first checking with Davidson.

Employees were permitted to bid on assigned starting times or routes on the basis of their seniority. Once all starting times and routes had been filled, the "on-call" slots were offered to the next most senior employees. Day-to-day, i. e., temporary, work opportunities were offered to the "on-call" drivers, and then to drivers on layoff, in descending seniority order. The collective bargaining agreement required that work opportunities be offered to employees who had seniority before they were offered to temporary or casual employees, and

Davidson's policy was to recall laid-off drivers in the order of greatest seniority.

Burris was on layoff status for most of his tenure with Davidson. He was laid off and recalled to permanent employment on several occasions, until December 20, 1974, his last date of layoff. Burris was not thereafter recalled to permanent employment. Three other employees were also laid off on December 24, 1974. One of them, employee Sears, a white man, had less seniority than did Burris, while two other white drivers, Foster and Sproates, had greater seniority. In fact, due to a declining volume of business during the period 1974 through 1979, Davidson was forced to lay off increasing numbers of employees. By December of 1976, drivers Lloyd (white) and Zecca (white) had been laid off and, by November of 1977, drivers Madric (black), Moore (white), and Ellis (white) had been laid off for lack of work.

Drivers on layoff were usually recalled by telephone for temporary work.[2] Day-to-day work opportunities offered to drivers "on-call" and on layoff arose when regularly assigned drivers "booked-off," i. e., declined to work due to illness, personal business or other reasons, or when Davidson's workload was unusually heavy. The decision to create a day-to-day work opportunity was usually made by a dispatcher, a managerial employee.

After the dispatcher determined that a work opportunity existed, he would telephone the most senior employee who was not assigned to work that day. If the senior employee refused the job opportunity, then the dispatcher would call the next most senior employee, and so on down the seniority list, until he located an employee who was available to work. This process was repeated as each separate work opportunity became available, starting with the most senior employee not working.

If the employee called did not answer, and Davidson did not need a driver for

2. Permanent recall from layoff, not at issue in this action, was accomplished by registered letter or telegram.

several hours,[3] the dispatcher might wait for a short period of time, *i. e.*, about fifteen minutes, and attempt to contact the same driver again before moving on to the next senior driver. On the other hand, if Davidson needed a driver immediately or within a short period of time, the dispatcher would immediately offer the work opportunity to the next most senior employee. If someone answered the employee's phone, but the employee was not home, the person was instructed to notify the driver to call the terminal as soon as possible. If the person answering the telephone indicated that he could not contact the driver or that the driver was unavailable, or if Davidson needed a driver within a short period of time, the dispatcher would offer the work opportunity to the next most senior employee.

If a driver from the seniority list was not available, Davidson then offered the work opportunity to a casual employee. Such casual employees were typically drivers who were unemployed or who were employed by other companies but were not working on a particular day. There was no seniority among casual employees, and there was no requirement that a casual employee be a member of the Union.

Since the collective bargaining agreement required all work opportunities to be assigned on the basis of seniority, failure to recall employees in the order of seniority constituted a violation of the Union contract. Alleged violations by Davidson of the seniority rules governing allocation of day-to-day work opportunities could be challenged through a grievance procedure established by the collective bargaining agreements. Indeed, such alleged violations of the drivers' seniority rights were frequently and vigorously challenged by the shop steward and Union members. Both the shop steward and Union members monitored Davidson's temporary recalls in order to enforce contractual provisions requiring that work opportunities be offered initially to drivers with seniority. An employee who believed he had been bypassed could institute a grievance with the steward. Likewise, the steward or another Union driver could and did initiate grievances regarding bypassing on behalf of another employee when they observed a casual employee working if they believed that Davidson had not offered the work opportunity to a laid-off driver.

In order to substantiate its position should a grievance be filed, Davidson had a policy of verifying the making of calls to employees with seniority. Usually these calls were verified by having a Union employee telephone the driver either initially or after the dispatcher had called and received no answer. However, if no Union employee was available, Davidson either contacted the Union and requested that it verify the call or simply did not verify the call.

There was no single method of recording the verification of a telephone call. Some dispatchers kept a written record of verification, either on the back of the employee's time card or in a separate journal, while others relied on memory. Because the collective bargaining agreement required that grievances regarding offering work opportunities to employees out of seniority order be raised within ten days of the incident, memorialization of verifications was unnecessary except to aid the dispatcher's memory. When a question arose, the employee who was alleged to have verified the call was asked whether he had done so. Indeed, Union steward Robinson and Union business agent Ciabattoni stated that they never looked to the time cards to determine whether a Union member had verified the call; rather, they spoke with the Union member directly. Accordingly, the absence of a record of verification on the back of an employee's time card does not indicate that Davidson failed to offer that employee a work opportunity.

3. The collective bargaining agreements required Davidson to allow the driver two hours to report for work.

On October 17, 1974, Burris filed his first written grievance against Davidson alleging that a less senior employee was called to work while Burris was not called. Davidson determined that the dispatcher had made a mistake and paid Burris for the day's work missed, and agreed that all attempts to recall laid-off employees would be verified. On October 28, 1975, Burris filed a second grievance alleging that he was bypassed on October 22, 1975. The investigation and evidence adduced at the grievance hearing revealed that Burris was not at home when Davidson called, and thus, the grievance was ultimately denied. Burris also protested bypassing on November 2, 1977. On that occasion, Burris had not been at home when Davidson called; instead, the dispatcher had spoken to his wife. When Burris called back later, he was informed that Davidson had called another driver. Burris protested to the Union. As a result of discussions between the Union and Davidson, Burris was offered another work opportunity that same day.

Grievances filed by other employees reveal that white employees were similarly bypassed and filed grievances in protest. For example, on February 27, 1975, white drivers Moore and Brice claimed that they were bypassed in favor of less senior employees. The grievance committee found that Brice had been bypassed and awarded him one-half day's pay. On October 10, 1977, white driver Dempsey was available for work, but the dispatcher failed to call Dempsey at the number he had left. When Dempsey filed a grievance alleging bypassing, Davidson resolved the matter by paying him a day's pay. Employees Pritt, Ellis, and Young, all white, similarly filed grievances alleging bypassing in the period 1977–80, and were paid a day's pay when their grievances were upheld.

From December, 1974 until the end of 1979, Burris was generally available for recall to work by Davidson. Davidson's dispatchers called Burris on various occasions to offer work opportunities, and Burris accepted the offers on some occasions and reported to work. On at least two occasions Burris accepted an offer of work, but did not report to the terminal. On many occasions, there was no answer when the terminal telephoned Burris, which permitted the dispatcher to call a less senior driver. Further, the evidence reveals that Burris was unavailable for work on several occasions: when he worked for another employer in November, 1975; when he underwent surgery in April, 1977; and when he was employed by Hall's Motor Freight from September 8, 1977 until March, 1978.

During the 1975–79 period, there were many occasions on which Burris did not work and other employees with less or no seniority did work and for which there is no memorialized verification on the time card or in any other record of any attempt to recall Burris.[4] There were also at least an equal number of occasions on which a white employee with seniority did not work, while an employee with less or no seniority did work, for which there is no memorialized verification of a recall attempt.

## II. LEGAL ISSUES

Plaintiffs have asserted a claim under both Title VII of the Civil Rights Act of 1964[5] and the Civil Rights Act of 1866, 42 U.S.C. § 1981.[6] Both prohibit discrimina-

---

4. The Court has spot-checked defendant's chart summary of the time cards for this period. While some discrepancies exist, the chart is a substantially accurate representation of the gross number of notations on the time cards indicating employment or the presence or absence of memorialized verification of recall attempts of on-call, laid-off, and casual employees. The chart summary is Appendix 1 to Defendant's Post Trial Memorandum, Docket at 95.

5. Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a), provides:

It shall be an unlawful employment practice for an employer (1) . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin. . . .

6. 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for

tion in employment on the basis of race. Despite procedural differences, both require proof of the same elements and provide the same substantive protection, *New York City Transit Authority v. Beazer,* 440 U.S. 568, 583–84 n.24, 99 S.Ct. 1355, 1364–65 n.24, 59 L.Ed.2d 587 (1979); *Scott v. University of Delaware,* 601 F.2d 76, 79–80 n.2 (3d Cir. 1979), at least where the Title VII claim is one of disparate treatment, as here. *Crawford v. Western Electric Co.,* 614 F.2d 1300, 1309 (5th Cir. 1980). Since in addition plaintiffs have framed their legal argument principally in terms of Title VII, the Court will omit any further specific reference to § 1981.

In this Title VII action, the Court must determine whether Burris was subjected to disparate treatment in recall to employment as a result of his race by using the three-step procedure set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell,* plaintiffs have the initial burden of establishing a prima facie case of discrimination. If the plaintiffs satisfy this requirement, the burden shifts to Davidson to articulate some legitimate, non-discriminatory reason for its actions. If Davidson does so, plaintiffs must then prove that these stated reasons were merely a pretext for discrimination. *Id.* at 802–804, 93 S.Ct. at 1824–1825.

■ In *McDonnell,* the Court enumerated the following elements of a prima facie case of discrimination in hiring: (1) that the plaintiff belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *Id.* These elements must be modified somewhat here to conform to the claim of discrimination in recall of a laid-off employee, but the

essence of the prima facie case remains the same: a showing that plaintiff was treated differently from similarly situated individuals of different racial groups. *Jackson v. U.S. Steel Corp.,* 624 F.2d 436, 440–441 (3d Cir. 1980); *Whack v. Peabody & Wind Engineering Co.,* 595 F.2d 190, 193 (3d Cir. 1979). The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978).

■ Plaintiffs argue that such a prima facie case would be established here by a showing that: (1) Burris was a black employee; (2) Burris was a qualified truck driver on layoff status who had recall rights by virtue of his seniority from December, 1974 through December, 1979; and (3) white drivers having less or no seniority were called to work on certain occasions and Burris did not work for Davidson on these occasions. Davidson contends that plaintiffs must instead show that Burris was not offered work opportunities while similarly situated white employees were. Although it is tempting to regard Burris and the casual drivers as similarly situated persons and to argue that the factor of seniority should not enter into the equation, were Burris and the casual drivers so treated, this would be a completely different case. The question then would be the basis for Davidson's order of offering work opportunities to a pool of potential employees with no seniority. Instead, the question here is whether Davidson failed to offer work opportunities to Burris because of his race, although required to do so by the Union contract. The only similarly situated persons for this purpose are those white drivers on layoff from Davidson during the years 1975–79.[7]

the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

7. Had there been no other laid-off drivers, comparison of Burris and the casual employees might have raised the necessary inference of discrimination; the Court need not decide this question here, for the circumstances dictate the nature of the prima facie case.

Not only must plaintiffs prove disparate treatment of Burris and those white drivers on layoff, but plaintiffs must establish that Burris was not offered work opportunities in accordance with his seniority as were the white drivers. It is Davidson's alleged failure to offer work opportunities to Burris which is at issue; the fact that Burris or another laid-off driver did not work on a particular day while a casual driver did is no proof of Davidson's malfeasance. Since Burris's situation is to be compared to that of the white drivers on layoff, all but one of whom had greater seniority than did Burris, the relevant action is not Davidson's actual employment of the various drivers, but its efforts to recall the drivers in accordance with seniority.

Plaintiffs argue that memorialized verification on the time card of an attempt to contact a driver was a standard and required practice at Davidson and that the absence of such notation establishes that no attempt was made. The evidence does not support this theory. Although Davidson's terminal manager, Helen Widdoes, asked and advised dispatchers to obtain verifications on the time cards, the dispatchers did not follow this practice, nor were many of the Union employees willing to be involved in such method of verification. The major impetus for the practice of verification was the threat of a grievance being filed by a by-passed driver. Since such a grievance generally had to be filed within ten days of the incident, Davidson did not have to have a written verification, but could rely on its access to the Union employee who had verified the call.

Further, the Court finds it hard to believe that regular drivers who were Union employees did not apprehend or complain about the extensive violation of seniority rights of Burris and the white drivers on layoff which must have occurred according to plaintiffs' theory. If plaintiffs' theory is adopted, Davidson engaged in repeated violations of the seniority rights of at least five white drivers (Zecca, Lloyd, Foster, Sproates, and Sears), as well as Burris. Yet the testimony of the shop steward indicates that he and other Union employees attempted to monitor Davidson's recall practices. Given the small size of Davidson's work force and the access which the shop steward and Union representative had to Davidson's time cards, it is inconceivable that the quantity of violations postulated could have resulted in so few complaints.

This evidence is buttressed by the testimony of the dispatchers and the terminal manager that laid-off drivers were offered work opportunities in order of seniority, and before casual drivers were called, in accordance with the Union contract. While the existence of grievances which were resolved in the employees' favor demonstrates that the proper procedure was not always followed, the evidence establishes that there was general compliance.

Even if plaintiffs are correct in arguing that the absence of a notation on the time card can be equated with a failure to attempt to recall, the time cards indicate that Davidson also did not attempt to recall white drivers on layoff, rather than employ casual drivers. Plaintiffs have presented no direct evidence that the white drivers on layoff were in fact called despite the lack of verification on the time cards. Nor does the statistical evidence which plaintiffs introduced prove that the lack of notation indicated no attempt to recall only in the case of Burris. Statistical evidence might have been used to discredit Davidson's reasons for its actions once a prima facie case had been presented. However, the Court cannot infer from the statistical evidence of Davidson's historical pattern of employing black drivers that despite the universal absence of notation on time cards, Burris alone received discriminatory treatment. Statistical evidence cannot replace the missing prima facie evidence of disparate treatment.

### III. CONCLUSION

Given the lack of evidence that Davidson treated Burris and the white drivers on layoff differently in recalling them for temporary work, plaintiffs have not established a prima facie case of discrimination. Since plaintiffs have failed to prove a violation of Title VII, judgment will be entered for the defendant.